UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

GIDEON LEWIN,

               Plaintiff,                             11-CV-8767 (KMW) (FM)

                                                      OPINION & ORDER

      -against-

THE RICHARD AVEDON
FOUNDATION,

               Defendant.
-----------------------------------------------------X
WOOD, U.S.D.J.:

      Plaintiff/Counterclaim Defendant Gideon Lewin brings this action against

Defendant/Counterclaim Plaintiff the Richard Avedon Foundation (the "Foundation").  Lewin

seeks a declaratory judgment that he is the copyright owner of photographs he created

concerning famed photographer Richard Avedon, as well as the owner (but not copyright holder)

of certain prints created by Avedon, and allegedly gifted to Lewin.  Lewin also claims that the

Foundation tortiously interfered with a publishing contract between Lewin and a book publisher.

The Foundation counterclaims, seeking a declaratory judgment that it is the copyright owner of

the above-mentioned photographs, and brings claims for conversion, replevin, breach of

fiduciary duty, fraud, and the misappropriation of trade secrets.

      Lewin moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary

judgment on all of his claims.  The Foundation cross-moves for summary judgment on its

copyright ownership, conversion, replevin, and faithless servant liability claims, and seeks

dismissal of Lewin's tortious interference claim.  For the reasons stated below, Lewin's motion

is DENIED in part, and GRANTED in part.  The Foundation's motion is DENIED in part, and

GRANTED in part.

## I.       BACKGROUND

Lewin worked for Richard Avedon, a world-renowned photographer and owner of

Avedon Studio (the "Studio"), from 1964 to 1980.  Lewin began work at the Studio shortly after

he graduated from art school.  (Lewin Statement of Undisputed Facts ("Lewin SUF") [ECF No.

90] at ¶¶ 1–2).  He initially worked as a photography assistant to Avedon, and then in 1965, was

promoted to be Avedon's studio manager.  (*Id.* ¶¶ 2–3).

The parties disagree as to what were the responsibilities of assistants and studio managers

employed by the Studio.  Lewin claims that his responsibilities included "setting up the Avedon

studio for photographic shoots, lighting, printing photographic prints for shows, printing limited

edition prints of photographs, administrative tasks, making travel arrangements, traveling with

Avedon on shoots, logistics, customs related activities, correspondence with contacts on

locations, and the designing and building of sets."  (Compl. [ECF No. 1] at ¶ 12).  He

specifically contends that his duties "did not include, require or contemplate that [he] would

create photographs or act in any way as a photographer."  (*Id.* ¶ 13).

The Foundation claims that assistants and studio managers were required to take

photographs on Avedon's behalf.  *See* (Foundation Statement of Undisputed Facts ("Foundation

SUF") [ECF No. 84] at ¶ 31) ("The Studio photography assistants also would take photographs

from time to time at Mr. Avedon's direction.  For instance, Mr. Avedon would instruct his

assistants to take photographs of him to use for publicity purposes.").

Lewin also alleges that he had a "special relationship" with Avedon, and that, because of

this fact, Avedon allowed Lewin to have his own clients while remaining a Studio employee.

(Lewin Mem. in Supp. [ECF No. 138] at 4).  Lewin claims that by 1972, he worked out an

arrangement with Avedon whereby, during times that Lewin was not specifically assisting

Avedon, Lewin could have full use of Avedon's studio for Lewin's own clients, provided that doing so did not interfere with Avedon's work. (Lewin SUF ¶¶ 16–19). This agreement required Lewin to pay Avedon 60% of whatever fee Lewin received when Lewin's work required use of Avedon's studio. (Lewin Aff. [ECF No. 98] at ¶¶ 17–21).

The Foundation disputes this claim, and contends that in certain instances, Avedon would secure additional photography work for Lewin, related to Avedon's own clients. (Foundation Response to Statement of Undisputed Facts ("Foundation Response") [ECF No. 104] at ¶ 20). For instance, if Vogue hired Avedon to photograph a particular model, Vogue might pay Avedon an additional fee for behind-the-scenes photographs of that shoot. According to the Foundation, those behind-the-scenes images were sometimes photographed by Lewin, as an Avedon employee. In such instances, the Foundation claims that Avedon paid Lewin 40% of the fee Avedon's client paid Avedon for this additional work. (*Id.*)

It is uncontested that throughout his time working with Avedon, Lewin took approximately 4,200 photographs that involved Avedon or his work. (Foundation SUF ¶ 160). (Lewin Dep. [ECF No. 91-1] at 397). Lewin, in his complaint, places these photographs into eighteen distinct categories, all of which generally consist of either behind-the-scenes images documenting Avedon's photoshoots, portraits of Avedon or images that focus on him, or photographs of some of the work Avedon exhibited at museums and galleries across the country. (Compl. ¶ 31). Lewin retained the negatives for most or all of these images, and claims to own the copyright to them. *See, e.g.*, (Lewin SUF ¶ 52) (asserting that the negatives of images Lewin photographed, concerning Avedon's exhibition in the Metropolitan Museum of Art, have been in Lewin's possession for thirty-six years); (*id.* ¶ 124) (claiming that the negatives of images Lewin

photographed, concerning certain portraits Lewin photographed of Avedon, have been in Lewin's possession for thirty-eight years).

Lewin alleges that he took all of these photographs on his own time, for personal reasons. *See, e.g.*, (*id.* ¶ 46) (stating that Lewin shot all of the disputed photographs concerning the Metropolitan Museum of Art "on his time over several days, including a weekend"); (*id.* ¶ 219) (asserting that all of the photographs Lewin captured during his trip to Montana with Avedon were "personal snapshots," unrelated to his work for the Studio). According to Lewin, Avedon consented to these photographs, when consent was necessary, and sometimes offered Lewin suggestions as to how the photographs might be constructed; but Avedon never instructed Lewin to take these photographs, nor was taking the photographs a part of Lewin's employment with the Studio. *See* (Lewin Mem. in Supp. 17–26). The Foundation asserts that Lewin took these photographs at Avedon's behest, did so on Avedon's time, and typically used the Studio's equipment to do so. *See* (Foundation Mem. in Supp. [ECF No. 136] at 7–10).

Avedon died in 2004. (Foundation SUF ¶ 2). Upon his death, all of the copyrights Avedon owned passed to the Foundation. (*Id.*) Avedon had created the Foundation shortly before his death "with the mission of supporting the preservation of Mr. Avedon's legacy and body of work." (*Id.* ¶ 1).

In 2006, Lewin met with Norma Stevens, the Executive Director of the Foundation until 2009, to discuss his plan to write a book detailing his time working for Avedon. (Lewin SUF ¶ 337); (Roth Decl. [ECF No. 94] at ¶ 1) (describing Stevens as the first Executive Director of the Foundation, and noting that she left the Foundation in 2009). The parties dispute what transpired at that meeting. Lewin claims that during the meeting he showed Stevens approximately fifteen images that Lewin had photographed during his time working for Avedon—images he planned

to include in the book.[1]   The Foundation argues that Lewin has no proof that he showed Stevens

any photographs.  *See* (Foundation Response ¶ 337) ("Lewin fails to provide any evidence, aside

from his own affidavit, that confirms that he presented any images to any employee of The

Foundation in May of 2006.").

Both parties agree, however, that after the meeting, Stevens sent an email to a colleague,

which stated in part:

> Gideon Lewin, one of Dick's [i.e. Avedon's] early assistants, was here today.  He
> has many pics of Dick working (running after models?) and with Arbus and Marvin,
> etc. and is preparing a "dignified" book.  I made it clear that the Foundation can't
> prevent him from using his pics, but our interest is the work, not exploiting the
> person.

(Lewin SUF, Ex. 1 [ECF 90-1] at RAF3296) (alteration added).  At that time, representatives of

the Foundation informed Lewin that the Foundation was too busy to work with Lewin on his

project.  (Lewin SUF ¶ 338).

Between 2010 and 2011, Lewin made a second attempt to secure the Foundation's

involvement in his book project.  To do so, he met with additional Foundation representatives,

including John Avedon, Richard Avedon's son.  (*Id.* ¶¶ 345, 347–49).  During these meetings,

the Foundation expressed its willingness to support Lewin's book project by providing research

assistance and access to Foundation files.  (*Id.* ¶ 351); (Foundation SUF ¶¶ 99–100).  The

Foundation also agreed to allow Lewin to license a limited number of Avedon-created images for

use in the book.  (Foundation SUF ¶¶ 131–33).  In March 2011, Lewin contracted with Assouline

Publishing to publish the book.  (Lewin SUF ¶ 356).  Part of the contract required Lewin to

---

[1] Lewin stated in his deposition that he provided Stevens with approximately fifteen images.  *See* (Lewin Dep. 337–38).  In his later-filed affidavit, Lewin claims that he provided fifty images to Stevens at this meeting. (Lewin Aff. ¶ 127).  Because "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony," *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996), I do not credit Lewin's affidavit on this point.

receive approval from the Foundation for the use of certain Avedon-created images. (Foundation SUF ¶ 107).

Over the next few months, Lewin submitted to the Foundation mock-ups of the book and draft versions of its text. (*Id.* ¶¶ 136, 146). The Foundation reviewed these submissions, and made suggestions for changes. (Lewin SUF ¶ 361).

The Foundation claims that during this review and revision process, it became concerned that some of the images Lewin claimed he owned actually belonged to the Foundation. (Foundation SUF ¶¶ 147–50). The Foundation eventually spoke with Lewin and claimed ownership over the photographs discussed above. (*Id.* ¶¶ 150–54); (Lewin SUF ¶ 362).

Around this time, the Foundation informed Assouline that it would no longer continue to work with Assouline or Lewin on Lewin's book. (Foundation SUF ¶ 161). The Foundation told Assouline that if Assouline proceeded with Lewin's book, Lewin and Assouline would "have a legal battle on [their] hands." (Lewin SUF ¶ 365). Assouline subsequently terminated the publishing contract with Lewin on the ground that Lewin had failed to secure the Foundation's cooperation in the publication of the book. (*Id.* ¶ 367).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). A "material" fact is one that might "affect the outcome of the suit under the governing law." *Id.* The moving party bears "the burden of demonstrating that no material fact exists." *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008).

In resolving this inquiry, the Court must construe "the evidence in the light most favorable to the nonmoving party" and draw all reasonable inferences in that party's favor. *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 255 (1986)). *See also Treglia v. Town of Manlius*, 313 F.3d 713, 718–722 (2d Cir. 2002) (on summary judgment, a court "must resolve all ambiguities and draw all factual inferences in favor of the non-movant."). In opposing the motion for summary judgment, the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), or on mere denials or unsupported alternative explanations of its conduct, *see S.E.C. v. Grotto*, No. 05-CV-5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006) (Lynch, J.). Rather, the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor. *Anderson*, 477 U.S. at 255–56. To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of the truth. *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 248–49).

## III.   STATUTE OF LIMITATIONS

Many of the events critical to the outcome of this litigation took place over twenty years ago. As a result, this case raises several statute of limitations questions that I must decide before proceeding to the parties' substantive claims.

Lewin alleges that the Foundation's copyright ownership, conversion, replevin, and breach of fiduciary duty claims are all time-barred by the applicable statute of limitations. *See* (Lewin Mem. in Opp'n [ECF No. 140] at 14–18). I consider each of these allegations in turn.

7

## A. Legal Standard

### i. Copyright Ownership

Civil actions under the Copyright Act are subject to a three-year statute of limitations. *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996) (citing 17 U.S.C. § 507(b)). When a party brings a claim for copyright ownership (as opposed to copyright infringement), accrual is measured from the time "when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (internal quotation marks omitted). "[A]ny number of events can trigger the accrual of an ownership claim, including [a]n express assertion of sole authorship or ownership." *Id.* (internal quotation marks omitted) (alteration in original).

### ii. Conversion/Replevin

There is a three-year statute of limitations in New York for both replevin and conversion claims. *See* N.Y. C.P.L.R. § 214(3). In New York, when a party brings a claim against the alleged thief, knowledge of the alleged theft is not required to start the running of the statute of limitations. *See Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 318 (1991) ("[W]hen the stolen object is in the possession of the thief . . . the Statute of Limitations runs from the time of the theft, even if the property owner was unaware of the theft at the time that it occurred." (internal citations omitted)); *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999) (Sand, J.).

### iii. Fiduciary Duty

In New York, a claim for breach of fiduciary duty is governed by a three-year statute of limitations when only monetary damages are requested, and a six-year statute of limitations when equitable relief is sought. *People ex rel. Spitzer ex rel. Ultimate Charitable Beneficiaries*

*v. Ben*, 55 A.D.3d 1306, 1308 (N.Y. App. Div. 2008). "The statute of limitations is tolled until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated." *Id.* (internal quotation marks omitted).

### iv.   Equitable Tolling

The "essence" of the equitable tolling doctrine is that "a statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Dillman v. Combustion Eng'g, Inc.*, 784 F.2d 57, 60 (2d Cir. 1986) (internal quotation marks omitted). The statute of limitations may be equitably tolled due to the defendant's fraudulent concealment if the plaintiff establishes that "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (internal quotation marks omitted). Equitable tolling is "applicable only in rare and exceptional circumstances." *Phillips v. Generations Family Health Ctr.*, 723 F.3d 144, 150 (2d Cir. 2013) (internal quotation marks omitted). Additionally, "[t]he law does not permit equitable tolling when a party simply did not realize the 'extent' of his claim. Instead, equitable tolling is only available when the party is unable, through due diligence, to discover that he has any claim at all." *Ruso v. Morrison*, 695 F. Supp. 2d 33, 46 (S.D.N.Y. 2010) (Castel, J.).

Typically, fraudulent concealment sufficient to justify equitable tolling exists only where the defendant has engaged in "affirmative acts of misrepresentation or concealment." *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 746 (S.D.N.Y. 1997) (Kaplan, J.). "However, some decisions suggest that the failure to disclose facts underlying a claim, even without any

9

affirmative acts of concealment, nevertheless may equitably estop a statute of limitations defense if the defendant stood in a fiduciary relationship which obligated the defendant to inform the plaintiff of such facts."  *Id.*; *see also St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 186–87 (E.D.N.Y. 2010) ("'Where concealment without actual misrepresentation is claimed to have prevented a plaintiff from commencing a timely action, the plaintiff must demonstrate a fiduciary relationship . . . which gave the defendant an obligation to inform him or her of facts underlying the claim.'" (quoting *Zumpano v. Quinn*, 849 N.E.2d 926, 930 (N.Y. 2006))).

## B.  Analysis

### i.  Copyright Ownership

The Foundation's copyright ownership claims are untimely, and therefore must be dismissed.[2]  In 2006, Lewin met with Stevens, the executive director of the Foundation at the time, and discussed with her his desire to publish a book about his time working for Avedon. Although it is not clear how many photographs Lewin showed Stevens, or even whether he showed her any photographs at all, it is clear that the two did discuss Lewin's photographs enough for Stevens to understand that Lewin possessed "many" photographs of "Dick working (running after models?) and with Arbus and Marvin, etc."  (Lewin SUF, Ex. 1, at RAF3296). Additionally, writing to a colleague after the meeting ended, Stevens stated that she "made it clear that the Foundation can't prevent [Lewin] from using his pics."  (*Id.*).

At some point during this meeting, Lewin made an "express assertion of sole authorship or ownership," sufficient to put a "reasonably diligent plaintiff . . . on inquiry as to the existence

---

[2] However, the statute of limitations cannot bar the Foundation's work-for-hire defense to Lewin's copyright ownership claims.  *See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003) ("A defendant who . . . asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations." (citing *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 77 (1956))).

of a right." *Kwan*, 634 F.3d at 228 (internal quotation marks omitted). Accordingly, the statute of limitations for the Foundation's copyright ownership claims accrued in 2006.

In her email, Stevens acknowledged not simply that Lewin possessed photographs of Avedon, but that the Foundation was unable to prevent Lewin from publishing those photographs in the book he was seeking to write. The Foundation claims that Stevens's reference to "[Lewin's] pics" "offers no information as to whether Lewin claimed copyright ownership" over the photographs, (Foundation Suppl. Brief [ECF No. 163] at 4), but this is incorrect. The only thing that would prevent the Foundation from blocking Lewin's publication of his photographs would be if Lewin not only possessed the photographs, but owned the copyright in them. If Stevens had assumed, during and immediately following her meeting with Lewin, that the Foundation owned the copyright in the images Lewin discussed with her, the Foundation would have had full authority to prevent Lewin from publishing the photographs. *See HarperCollins Publishers LLC v. Open Rd. Integrated Media, LLP*, 58 F. Supp. 3d 380, 385 (S.D.N.Y. 2014) (Buchwald, J.) (explaining that copyright law allows a copyright owner to seek an injunction against a copyright infringer). Thus, Stevens's email clearly demonstrates that she, as head of the Foundation, was on notice as early as 2006 that Lewin was claiming copyright ownership over photographs he took during his time working for Avedon—photographs that directly involved Avedon and his work. This notice created in the Foundation a duty to investigate Lewin's copyright claims, and it was at this point that the statute of limitations accrued.

The Foundation argues that Lewin could not have made an "express assertion of adverse ownership" because during his deposition, he affirmed that neither he nor Stevens discussed the question of copyright during that meeting. *See* (Lewin Dep. 339–40). However, Lewin and Stevens did not need to have overtly discussed copyright for Lewin to have made an express

11

assertion of ownership.  Lewin met with Stevens, discussed his book, and discussed photographs he had taken while working with Avedon.  Stevens's email makes clear that based on something Lewin showed her, or something he told her, she understood that Lewin believed he owned the copyright in the photographs Lewin either showed or described to Stevens.[3]  This is sufficient to constitute an "express assertion of adverse ownership."  *See Sieger Suarez Architectural P'ship, Inc. v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340, 1355 (S.D. Fla. 2014) (finding a claim of copyright infringement to have accrued at the time that defendant sent plaintiff a copy of the architectural plans that plaintiff claimed infringed its copyright).  It provided the Foundation with "'timely knowledge sufficient to place [it] under a duty to make inquiry and ascertain all relevant facts.'"  *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 266 (S.D.N.Y. 2006) (Karas, J.) (quoting *Gleason v. Spota*, 194 A.D.2d 764, 765 (N.Y. App. Div. 1993)).

The Foundation relies on *Welles v. Turner Entertainment Co.*, 503 F.3d 728 (9th Cir. 2007), to argue that Lewin's actions cannot constitute an express assertion of ownership.  The decisions of other circuits provide merely persuasive, and not precedential, authority.  Furthermore, I find *Welles* distinguishable from the facts at bar.

*Welles* involved the copyright ownership of *Citizen Kane*, a film written and directed by Orson Welles, and released in 1941.  *Id.* at 731–32.  Plaintiff, Orson Welles's daughter, claimed copyright ownership over the film, and sought a declaratory judgment prohibiting Defendant from releasing the film in video format.  *Id.* at 733.  Defendant argued that Plaintiff's claim was time-barred because Defendant and attorneys for Orson Welles's estate had exchanged letters many years prior to Plaintiff's suit "regarding the inclusion of the *Citizen Kane* screenplay in a 'home video collector's edition gift set,'" and this put Plaintiff on inquiry notice of her copyright

---

[3] Stevens's email suggests that Stevens, too, believed that Lewin owned the copyright to these photographs at that time.

claim. *Id.* at 734.  The Ninth Circuit disagreed, stating, without explanation, that the letters were "not the plain and express repudiation of copyright ownership that our case law requires for the statute of limitations on a copyright ownership claim to begin running." *Id.*

The letters at issue in *Welles* are very different from the interaction between Lewin and Stevens.  Although it does appear that Plaintiff in *Welles* was aware of the letters between Orson Welles's estate and Defendant, *id.* at 734 (stating that the letters "might have informed Beatrice Welles that the defendants were distributing *Citizen Kane* on home video"), there is no suggestion that Plaintiff gave any indication that she understood from those letters that Defendant was claiming copyright ownership over the materials discussed.  Here, Stevens's email makes clear that she did understand that Lewin was claiming copyright ownership over the photographs discussed.

Accordingly, the statute of limitations began to run in 2006.  Because the Foundation did not bring its claims until 2011, long after the 3-year statute of limitations had run, its counterclaims for copyright ownership must be dismissed.

*ii.  Conversion/Replevin*

For similar reasons I find that the Foundation's conversion and replevin claims are also time-barred, but only with respect to the approximately 4,200 photographs Lewin took during his time working for Avedon, and not with respect to the Avedon-created materials the Foundation claims Lewin stole from the Studio.

In New York, the statute of limitations for conversion and replevin claims begins to run at the time of the alleged theft—even if the alleged victim has no knowledge of the theft.  *See Solomon R. Guggenheim Found.*, 77 N.Y.2d at 318; *Lennon*, 63 F. Supp. 2d at 439.  It follows

that the statute of limitations would ordinarily have started to run no later than 1980, the year in which Lewin left Avedon's employ.[4]

The Foundation argues, however, that the statute of limitations should be equitably tolled because Lewin fraudulently concealed his theft of Avedon's property from both Avedon and the Foundation.  *See* (Foundation Mem. in Opp'n [ECF No. 141] at 21).  "Under New York law, an agent is obligated 'to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (quoting *Western Elec. Co. v. Brenner*, 360 N.E.2d 1091, 1094 (N.Y. 1977)).  As an employee of Avedon's, Lewin had a fiduciary duty of loyalty to him.  The Foundation argues that Lewin violated that fiduciary duty when allegedly he stole from the Studio.  It correctly asserts that a violation of a fiduciary duty is sufficient to justify equitable tolling.  *See Whitney Holdings*, 988 F. Supp. at 746 ("[T]he failure to disclose facts underlying a claim, even without any affirmative acts of concealment, nevertheless may equitably estop a statute of limitations defense if the defendant stood in a fiduciary relationship which obligated the defendant to inform the plaintiff of such facts.").

Thus, if Lewin breached his fiduciary duty by stealing from Avedon, it would be appropriate to equitably toll the statute of limitations.  As I will discuss below, *see infra* Part VI.B, whether Lewin stole from Avedon, and thus whether Lewin breached his fiduciary duty, is a question of fact that the jury will need to decide.

Nonetheless, "such tolling is not indefinite.  It lasts only so long as the fraud is effective. Fraudulent concealment does not lessen a plaintiff's duty of diligence; it merely measures what a

---

[4] Presumably, once Lewin no longer worked for the Studio, he would not have had access to Studio materials in a way that would have made stealing them possible.

reasonably diligent plaintiff would or could have known regarding the claim." *Stone v. Williams*, 970 F.2d 1043, 1048–49 (2d Cir. 1992) (internal citations omitted).  Thus, assuming, *arguendo*, that the jury ultimately determines that Lewin did breach his fiduciary duty to Avedon sufficient to toll the statute of limitations, the question remains whether the 2006 meeting between Lewin and Stevens provided the Foundation with "'timely knowledge sufficient to place [it] under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable statute of limitations.'"  *Abercrombie*, 438 F. Supp. 2d at 266 (quoting *Gleason*, 194 A.D.2d at 765).  I hold that it did.

 As already discussed with respect to the Foundation's copyright ownership claim, Stevens's email makes clear that she left that 2006 meeting with an understanding that Lewin possessed, and claimed copyright ownership over, an indefinite number of photographs stemming from Lewin's time working for Avedon.  This knowledge was sufficient to put the Foundation on inquiry notice.

 The Foundation argues that showing Stevens only fifteen photographs was not enough to alert the Foundation to the fact that Lewin claimed copyright ownership over the "vast number of images in suit."  (Foundation Suppl. Br. 6).  Its claim, however, is contradicted by case law. "The law does not permit equitable tolling when a party simply did not realize the 'extent' of his claim."  *Ruso*, 695 F. Supp. 2d at 46; *see also Paige v. Police Dep't of Schenectady*, 264 F.3d 197, 200 (2d Cir. 2001) ("Although some of the facts putatively concealed by the defendants might have strengthened Paige's case by corroborating her story, we find that the absence of those facts did not sufficiently justify Paige in not pursuing her cause of action as to merit equitable tolling.").  "[A] plaintiff need not know each and every relevant fact of his injury . . . . Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts

of injury and causation to protect himself by seeking legal advice." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998); *see also Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000) (Chin, J.) (rejecting the plaintiff's plea for equitable tolling, noting that "[t]he fact that plaintiffs may not have had all the facts pertinent to their claims is of no consequence" because "[t]he question is whether plaintiff knew enough to sue").[5]  The photographs Lewin and Stevens discussed during that 2006 meeting were sufficient to create in the Foundation a duty to investigate further.  The Foundation failed to do so within the statute of limitations period, and therefore its conversion and replevin claims are barred to the extent they concern the approximately 4,200 Lewin-created photographs at issue in this suit.

The same cannot be said for the Avedon-created materials the Foundation alleges Lewin stole from the Studio.  The fact that Lewin possessed and claimed ownership over photographs he created could not have put the Foundation on inquiry notice that Lewin also possessed

---

[5] It is for this reason that the Foundation's reliance on *Lennon v. Seaman*, 63 F. Supp. 2d 428, is unpersuasive.  In *Lennon*, Yoko Ono sued a photographer for stealing photographs he had taken of Ono and John Lennon.  Ono claimed copyright ownership of the photographs under the work-for-hire doctrine, and brought a claim for recovery of chattels against the defendant.  *Id.* at 430–31.  The theft had occurred in 1981, and Ono did not bring suit until 1999, long after the 3-year statute of limitations had run.  *Id.* at 431–32.  Ono claimed, however, that the defendant had fraudulently concealed his theft from her.  *Id.* at 440–41.

In 1991, the defendant published a book, which he proved Ono had seen, containing a number of the photographs at issue in the suit.  *Id.* at 441.  Judge Sand held that because Ono had seen the book, she had been put on inquiry notice as to the defendant's possession of the photographs contained in the book, but not any additional photographs.  *Id.* at 442.  Accordingly, Judge Sand held that the statute of limitations began to run in 1991, and dismissed Ono's claims pertaining to those photographs she had seen as time-barred.  *Id.*

The Foundation argues that, based on *Lennon*, it cannot be held to have received inquiry notice about any photograph that Lewin did not show Stevens during their 2006 meeting.  This is incorrect for two reasons.  First, Judge Sand noted that the parties had not briefed the issue of whether "the discovery that the defendant possessed some of the plaintiff's property obligated the plaintiff to make inquiries as to what other items may be in the defendant's possession, or in some manner placed her on notice that he had other items from the Lennons."  *Id.* at 442–43.  Because of the lack of briefing, Judge Sand declined to grant the defendant's motion to dismiss concerning the remainder of the photographs "at [that] time," but granted the defendant leave to raise the issue at the appropriate time.  *Id.* at 443.  Thus, the fact that the parties had not briefed the issue of how the remaining photographs should be treated significantly weakens the authoritative force of Judge Sand's decision on that point.  Second, Judge Sand failed to take into account the fact that "a plaintiff need not know each and every relevant fact of his injury . . . . Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice."  *Kronisch*, 150 F.3d at 121.

Accordingly, I find the Foundation's reliance on *Lennon* misplaced.

Avedon-created prints and other materials.  The record does not give any indication that Lewin or Stevens discussed any such materials during the 2006 meeting.  If the jury finds facts sufficient to equitably toll the statute of limitations for the Foundation's conversion and replevin claims, the Foundation's conversion and replevin claims concerning the Avedon-created materials at issue in this suit must be found timely.[6]

### iii.   *Fiduciary Duty*

The statute of limitations cannot bar the Foundation's fiduciary duty claims.  Although the statute of limitations would ordinarily have begun to run when Lewin left Avedon's employment, *see People ex rel. Spitzer*, 55 A.D.3d at 1308 ("The statute of limitations is tolled until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated." (internal quotation marks omitted)), equitable tolling is applicable here to the same extent as it is for the Foundation's conversion and replevin claims concerning the Avedon-created materials.  The statute of limitations cannot serve as a defense to the Foundation's breach of fiduciary duty claim, because such a breach would inherently toll the

---

[6] The Foundation also counterclaims for unjust enrichment, based on the same theory of theft it relies on for its conversion and replevin claims.  (Am. Countercl.[ECF No. 17] at ¶¶ 151–59).  Unjust enrichment claims seeking equitable relief are governed by a six year statute of limitations under New York law.  *Lia v. Saporito*, 909 F. Supp. 2d 149, 167 (E.D.N.Y. 2012).  "However, if the unjust enrichment claim is merely incidental to or duplicative of another claim with a shorter limitations period, the Court will not allow a plaintiff to avail himself of the longer limitations period."  *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007) (Holwell, J.) (citing *Spinale v. Tenzer Greenblatt, LLP*, 309 A.D.2d 632 (N.Y. App. Div. 2003)).

As Judge Rakoff explained in *Kapernekas v. Brandhorst*, "'[i]n applying the Statute of Limitations, courts must look to the essence of the claim, and not to the form in which it is pleaded.'" 638 F. Supp. 2d 426, 428 (S.D.N.Y. 2009) (quoting *Green Bus Lines, Inc. v. Gen. Motors Corp.*, 169 A.D.2d 758, 759 (N.Y. App. Div. 1991)).  Judge Rakoff's reasoning in that case applies equally here:

> There is no indication that the remedy afforded by plaintiff's conversion and replevin claims would be in any way inadequate.  Thus, if the jury determines that plaintiff's conversion and replevin claims are not time-barred, those claims provide a complete remedy.  If, by contrast, the jury determines that such claims are time-barred, plaintiff cannot avoid the three-year statute of limitations by asserting other claims, based on the same facts, that really sound in conversion or replevin.

*Id.* at 428–29.

To the extent that the Foundation's conversion and replevin claims are time-barred, so too is its unjust enrichment claim.

statute of limitations.  *See Whitney Holdings*, 988 F. Supp. at 746 ("[T]he failure to disclose facts underlying a claim, even without any affirmative acts of concealment, nevertheless may equitably estop a statute of limitations defense if the defendant stood in a fiduciary relationship which obligated the defendant to inform the plaintiff of such facts.").

## IV.    THE DEAD MAN'S STATUTE

The Foundation alleges that portions of Lewin's testimony in this case is inadmissible under New York's dead man's statute.  I agree, but find that in many instances, the Foundation has waived the applicability of the statute.

### A.  Legal Standard

New York's dead man's statute provides, in relevant part, as follows:

> Upon the trial of an action . . . a party or a person interested in the event . . . shall not be examined as a witness in his own behalf or interest . . . against the executor . . . of a deceased person . . . concerning a personal transaction or communication between the witness and the deceased person . . . except where the executor . . . is examined in his own behalf, or the testimony of a . . . deceased person is given in evidence . . . , concerning the same transaction or communication.

N.Y. C.P.L.R. 4519.

In New York, a party waives the protection of the dead man's statute when the executor of the deceased testifies to the personal transaction or communication at issue.  *See Matter of Wood's Estate*, 418 N.E.2d 365, 367 (N.Y. 1981).  The interested party may then provide his or her account of that same transaction or communication in response.  However, "the waiver provision of the statute is construed narrowly."  *Clark v. Meyer*, 188 F. Supp. 2d 416, 421 (S.D.N.Y. 2002) (Kaplan, J.); *see also Martin v. Hillen*, 36 N.E. 803, 804 (N.Y. 1894) (noting that when an interested party is permitted to testify to the transaction or communication, that testimony "must be confined strictly to the same transaction or communication to which the executor or administrator has already testified in his own behalf.").

**B.  Analysis**

Federal courts in this district, like New York state courts, are somewhat divided on the question of whether a court, on summary judgment, may consider testimony that might be inadmissible at trial under New York's dead man statute.  *Compare Icahn v. Todtman, Nachamie, Spizz & Johns, P.C.*, No. 99-CV-11783, 2001 WL 1160582, at *4 (S.D.N.Y. Oct. 1, 2001) (Pauley, J.) ("evidence that is 'otherwise relevant and competent upon a trial or hearing, but subject to exclusion on objection under the Dead Man's Statute, should not predetermine the result on summary judgment in anticipation of the objection.'" (quoting *Phillips v. Joseph Kantor & Co.*, 291 N.E. 129, 130 (N.Y. 1972)), *with Pro Bono Investments, Inc. v. Gerry*, No. 03-CV-4347, 2005 WL 2429777, at *6 (S.D.N.Y. Sept. 30, 2005) (Koeltl, J.) ("[I]rrespective of how New York might decide this question, the federal rule requires exclusion of evidence on summary judgment motions which the dead man's statute would exclude at trial." (internal quotation marks omitted)); *see also Clark*, 188 F. Supp. 2d at 420 n.20 (noting that "New York cases seem to be divided" on whether the dead man statute applies to summary judgment motions, and citing cases on either side).  However, the most recent decisions addressing this issue, most prominently Judge Kaplan's decision in *Clark v. Meyer*, persuasively argue that Federal Rule of Evidence 56(e) "requires exclusion of evidence on summary judgment motions which the dead man's statute would exclude at trial."  *Clark*, 188 F. Supp. 2d at 420–21.

Lewin, as the plaintiff to this suit, is clearly an interested party.  *See Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996) ("Because she is the plaintiff in this action, Rosenfeld is interested.").  Thus, I hold that Lewin may not testify to any personal transaction or communication between himself and Avedon, unless the Foundation has waived the protection of the dead man's statute with respect to the specific transaction or communication at issue.

19

In many instances, the Foundation has waived the protection of the dead man's statute. For example, Lewin seeks to testify that he asked Avedon to pose for photographs while standing inside the miniature model of an exhibition Avedon was planning.  *See* (Lewin SUF ¶ 83).  The Foundation argues that Lewin's testimony concerning these photographs is inadmissible pursuant to New York's dead man's statute.  *See* (Foundation Reply to Statement of Undisputed Facts ("Foundation RSUF") [ECF No. 122] at ¶ 343) ("Lewin is not competent to testify in his own behalf against The Foundation as to his purported transactions or communications with Mr. Avedon, who is now deceased, about matters which bear on the property that is at issue in this lawsuit.").  However, the Foundation also contests Lewin's characterization of the events, and contends that it was Avedon who asked Lewin to photograph him.  *See* (Foundation SUF ¶ 343). By testifying to its version of events, the Foundation has "opened the door" to Lewin's testimony, and cannot seek to preclude Lewin from testifying about the same communication or transaction.  *See Rosenfeld*, 73 F.3d at 92 ("Testimony from an interested witness is inadmissible where death has prevented the estate from giving its version of the events.  It is when the estate advances evidence of the events that it has opened the door, and in such case a claimant against the estate may elicit such other testimony as needed to complete the picture.").

The remainder of this Opinion credits Lewin's testimony only where either the dead man's statute does not apply, or the Foundation has waived the protection of the statute.

## V.     COPYRIGHT OWNERSHIP OF THE 4,200 PHOTOGRAPHS

The main dispute in this case is over the approximately 4,200 photographs Lewin took during his time working for Avedon as a photo assistant and studio manager.  Lewin claims he owns the copyright to these images because he photographed them, and did so as personal "snapshots," on his own time.  The Foundation argues that it owns the copyright to these images

because Lewin photographed them as a part of his work responsibilities, and therefore that the photographs are "works for hire."[7]

### A.  Legal Standard

Copyright ownership "'vests initially in the author . . . of the work.'"  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (quoting 17 U.S.C. § 201(a)).  Although the author usually is the person who "actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection," copyright law "carves out an important exception" for a work "made for hire."  *Reid*, 490 U.S. at 737.  In such instances, "copyright law deems the *employer* to be the 'author' for purposes of copyright ownership," *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 137 (2d Cir. 2013) (emphasis in original).  If the employer is able to prove that the work was created as a work for hire, the work's creator can overcome the employer's presumptive authorship only "by evidence of an agreement to the contrary."  *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 556 (2d Cir. 1995).

Two statutes control the analysis of the work-for-hire doctrine.  The 1909 Copyright Act (the "1909 Act") governs all works created before January 1, 1978.  The Copyright Act of 1976 (the "1976 Act") governs all works created thereafter.  Because Lewin captured the photographs at issue here both before and after January 1, 1978, both Acts are relevant to this case.  Under the 1909 Act, courts determine whether a work is a work for hire by applying the "instance and expense" test.  *Marvel Characters*, 726 F.3d at 137.  Under the 1976 Act, courts must decide whether the work was "prepared by an employee within the scope of his or her employment."  17 U.S.C. § 101.  "[U]nder both the 1909 and 1976 Acts, a person's status as an employee renders a

---

[7] Although the Foundation's counterclaims of copyright ownership are barred as untimely, the Foundation may still offer its work-for-hire claims as a defense to Lewin's claims of copyright ownership.  *See Estate of Burne Hogarth*, 342 F.3d at 163.  Accordingly, the Court will treat the Foundation's summary judgment motions for these claims as motions to dismiss Lewin's claims of copyright ownership over the approximately 4,200 photographs.

work created within the scope of employment as a work for hire, as to which the copyright belongs to the employer . . . ." *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 636 (2d Cir. 2004).   Thus, for photographs taken before 1978, the Foundation can prove a photograph is a work for hire by meeting either the instance and expense test, or the scope of employment test.   For those photographs taken on or after January 1, 1978, the Foundation must meet the scope of employment test.

*i.   The 1909 Act (Instance and Expense Test)*

Under the 1909 Act, "'[i]nstance' refers to the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work.   Actual creative contributions or direction strongly suggest that the work is made at the hiring party's instance." *Marvel Characters*, 726 F.3d at 139.   The right to direct and supervise need simply exist; it does not need to be exercised.   *Martha Graham Sch.*, 380 F.3d at 635.   "The 'expense' component refers to the resources the hiring party invests in the creation of the work." *Marvel Characters*, 726 F.3d at 139.

The Second Circuit has counseled "against rigid application of these principles.   Whether the instance and expense test is satisfied turns on the parties' creative and financial arrangement as revealed by the record in each case." *Marvel Characters*, 726 F.3d at 140.

*ii.   The 1976 Act (Scope of Employment Test)*

The Supreme Court elaborated on the scope of employment test required by the 1976 Act in *Community for Creative Non-Violence v. Reid*.   The *Reid* Court held that determining whether a work is "prepared by an employee within the scope of his or her employment," 17 U.S.C. § 101, should be made "in light of agency law," 490 U.S. at 740.   The Court looked to the following factors:

22

we consider the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751–52; *see also Martha Graham Sch. & Dance Found*, 380 F.3d at 635–36.

## B.  The 4,200 Photographs Must Be Analyzed Individually[8]

At the root of this litigation is the approximately 4,200 photographs Lewin captured during the sixteen years he worked for Avedon.  If Lewin took any of these photographs within the scope of his employment by the Studio, the photograph is a work for hire; the Foundation, as Avedon's successor-in-interest, owns the copyright in any such work-for-hire photograph.  If Lewin took any photograph outside the scope of his employment, the copyright belongs to him, as the creator of the work.

The Foundation's argument regarding these photographs appears to proceed as follows.  Part of Lewin's duties as a Studio employee was to take photographs at Avedon's request.  All of the photographs in dispute in this case directly feature Avedon, or are directly related to

---

[8] Some of the analysis in this section is based on testimony offered by Lewin in the form of several affidavits.  The Foundation contends that Lewin's affidavits are inadmissible because they are "self-serving and conclusory."  *See, e.g.*, (Foundation RSUF ¶ 5 & n.1); *see also Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. Sept. 30, 2014) (Broderick, J.) ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment." (internal quotation marks omitted)).  But as the Second Circuit made clear in *Brown v. Henderson*, such affidavits are inadmissible only when "factual allegations that might otherwise defeat a motion for summary judgment . . . are made for the first time in plaintiff's affidavit opposing summary judgment and *that affidavit contradicts [a party's] own prior deposition testimony*." 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added).

Where statements made in Lewin's affidavits contradict his deposition testimony, I therefore do not credit those statements.  However, where there is no contradiction, I do credit those statements.

Additionally, the Foundation argues that the affidavit testimony of two witnesses, Ingrid Drotman and Maynard Switzer, should be precluded because Lewin failed to disclose the witnesses in his Federal Rules of Civil Procedure 26 disclosures.  *See* (Foundation Mot. to Exclude [ECF No. 132]).  I need not decide this issue, however, because the testimony of these witnesses does not affect the rulings I set forth below.

Avedon's work.  Therefore, all the photographs are works for hire, because any photograph taken by a Studio employee that involves Avedon or his work must fall within the scope of that employee's employment.  I do not find this a persuasive argument.

First, Lewin maintains that Avedon did not require him to take photographs.  *See* (Lewin Aff. ¶ 10) ("My duties and obligations [as a Studio employee] specifically did not include, require or contemplate that I would create photographs or act in any way as a photographer.").[9] And he is not alone.  Shonna Valeska, who served as a photo assistant to Avedon between 1978 and 1980—some of the final years Lewin served as studio manager—concurs: "No contract for employment was ever presented me.  All of the assistants were budding photographers and we all made photographs throughout our tenure at the studio and while on location.  We were never asked to shoot."  (Valeska Decl. [ECF No. 120] at ¶ 5).  Earl Steinbicker, who worked for Avedon between 1952 and 1965, agrees that "[n]one of the assistants did any assigned photography for the Avedon Studios."  (Steinbicker Aff. [ECF No. 99] at ¶ 10).

In contrast, James Varriale, a Foundation witness who served as a photo assistant for Avedon between 1978 and 1980, and then as the studio manager from 1980 to 1981, testifies that "[o]ne . . . responsibility [he] had while [he] worked for Mr. Avedon was to take certain photographs when directed to do so."  (Varriale Decl. [ECF No. 96] at ¶ 7).

These competing views concerning Studio employee duties must be assessed by the jury, based on its assessment of witness credibility, and the factual evidence submitted by the parties.

---

[9] The Foundation contends that Lewin's story as to whether his job duties included taking photographs has changed at least five times over the course of this litigation.  *See* (Foundation Mem. in Opp'n 10 & n.9).  However, this is not entirely true.  Lewin has consistently maintained, in his complaint, in his deposition, and in his affidavits, that taking photographs was not a part of his job responsibilities, generally.  *See* (Lewin Compl. ¶ 13); (Lewin Dep. 276–77); (Lewin Aff. ¶ 10).  The Foundation's confusion appears to stem from the fact that Lewin has admitted that part of his job responsibilities did include photographically documenting Avedon's museum exhibits.  *See e.g.*, (Lewin Dep. 91–92) (admitting that Avedon instructed Lewin and others to take photographs of the Marlborough exhibit "so we have an exact record of the show," and noting that those negatives remained with the Studio).  At no point in the record does Lewin ever admit that his general duties included photography in any other way.

Because a reasonable juror could infer from the record that Lewin's job responsibilities did not include taking photographs at Avedon's request, the Foundation has not established that all 4,200 photographs at issue in this suit are works for hire.

Even if it were undisputed that Lewin's job did require him to take photographs at Avedon's request, this fact alone is not sufficient to warrant summary judgment as to the copyright ownership of all of the disputed photographs. The fact that Lewin's job required him to take photographs, if true, does not necessarily prove that every photograph Lewin took that concerns Avedon in some way is owned by Avedon as a work for hire. If there were times between 1964 and 1980 when Lewin was "off the clock,"  photographs he took during those times, motivated by nothing more than Lewin's desire to take the photograph, would not constitute works for hire. Such photographs could not be within the scope of Lewin's employment, because they would have been taken during times when Lewin was not working, and for purposes unrelated to his employment.

This is the case even if those photographs involve Avedon in some way. For example, if Lewin had invited Avedon over to dinner, purely for social reasons, and during that time photographed Avedon enjoying the dinner, Lewin, as creator of the photograph, would own the copyright to it. That photograph would not have been taken within the scope of Lewin's employment, and therefore would not constitute a work for hire.

If Lewin was required to take photographs for Avedon as a part of his job duties, this would certainly have significant bearing on the way in which the photographs at issue in this suit should be analyzed; if it is not clear, either from testimony or other evidence, that a photograph was taken "off the clock," and if the contents of the photograph appear to relate to Avedon's work as a photographer, a jury could sensibly—perhaps easily—conclude that such photographs

were taken within the scope of Lewin's employment.  Such a photograph would be a work for

hire, owned by Avedon.  Yet, these are determinations that will need to be made for each

photograph in this suit.  In consequence, determining who owns the copyright to these 4,200

photographs requires assessing the photographs individually.

Lewin, in his complaint, has organized the approximately 4,200 disputed photographs

into eighteen categories.  In addition to those categories, the Foundation seeks the review of

photographs from an additional six events.  I have reviewed these categories, and find the

photographs organized within them sufficiently similar to warrant categorical, rather than

individual, review of the photographs at issue in this case.

Factual questions remain as to most of these categories, and therefore it is the jury, not

the Court, that must decide the copyright ownership claims for most of these categories.  For

three of these categories, however, no meaningful factual dispute exists, and therefore summary

judgment is appropriate.  I begin by discussing these three categories, and then turn to a

discussion of those categories where factual questions remain.[10]

## C.  Categories of Photographs For Which Summary Judgment is Appropriate

### i.  *Photographs from the Baja, California Photoshoot of Rachel Welch (Lewin Category 15)*

In 1973, Avedon photographed model Raquel Welch in Baja, California for *Vogue*

magazine.  (Lewin SUF ¶ 252).  Lewin was the only studio employee who accompanied him.

(*Id.* ¶ 253).  During the shoot, it appears that some sort of confrontation occurred between Welch

and Avedon.  (*Id.* ¶¶ 254–55).  Lewin claims that he suggested to Avedon that Lewin photograph

---

[10] The Foundation also argues that I should cancel Lewin's copyright registration because the photographs Lewin registered are works for hire, and because Lewin's failure to inform the Copyright Office of that fact constituted a fraud on the office.  *See* (Foundation Mem. in Supp. 33–35).  Because a jury will need to determine whether the vast majority of the photographs Lewin registered with the Copyright Office are works for hire, it is inappropriate to cancel Lewin's copyright registration at this time.

Welch throughout the trip as a way to distract her, and that somehow this would diffuse the confrontation.  (*Id.* ¶ 256); (Lewin Dep. 736–38).

The Foundation does not contest Lewin's description of events, but argues that Lewin's photography during the Raquel Welch photoshoot was within the scope of Lewin's employment, and that therefore these photographs are works for hire.  (Foundation RSUF ¶ 526); (Foundation Mem. in Supp. 30–32).  I agree.

Lewin admits that the purpose of photographing Welch was to distract her.  (Lewin SUF ¶ 256).  Such a distraction was not for Lewin's benefit, but for Avedon's; it allowed Avedon to complete the task he was being paid to do—photograph Welch.  Lewin claims that it was his idea to photograph Welch and not Avedon's, but this is irrelevant.  *See Martha Graham Sch. & Dance Found.*, 380 F.3d at 640–41 ("There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment.  Many talented people . . . are expected by their employers to produce the sort of work for which they were hired, without any need for the employer to suggest any particular project.").  It is similarly irrelevant whether Lewin's job responsibilities did or did not include photography.  In this instance, the undisputed facts make clear that Lewin photographed Welch, not for his benefit, but for Avedon's.  This is sufficient to find these photographs within the scope of Lewin's employment.[11]  They are, therefore, works for hire.[12]  I grant summary

---

[11] The outcome is the same under the "instance and expense" test applicable to the 1909 Act.  Lewin took the photographs at Avedon's instance because their purpose was to make it easier for Avedon to complete his job.  *See Marvel Characters*, 726 F.3d at 139 ("'Instance' refers to the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work.").  Additionally, the photographs appear to have been created at Avedon's expense.  *See id.* ("The 'expense' component refers to the resources the hiring party invests in the creation of the work.").  Some of the photographs were taken with a Studio camera.  (Lewin SUF ¶ 259).  Lewin's flight to Baja was also paid for through the Studio's arrangement with *Vogue*.  (Foundation SUF ¶ 518).

[12] Although Lewin could overcome Avedon's presumptive authorship by submitting "evidence of an agreement to the contrary," *Playboy Enterprises, Inc.*, 53 F.3d at 556, he has made no effort to do so in this case.

judgment to the Foundation, and dismiss Lewin's claim of copyright ownership, for the photographs in this category.

ii.   *Photographs Concerning the* Alice in Wonderland *Theatrical Performance*

One of Avedon's friends directed a play entitled *Alice in Wonderland*.  Lewin, in his deposition testimony, stated that Avedon "asked [Lewin] to do a favor and go and photograph" a group of individuals who had gathered at Avedon's home to raise funds for the performance. (Lewin Dep. 640–41).  Lewin stated that Avedon was not home at the time, and that had he been, "[Avedon] would have taken the photograph himself."  (*Id.* at 641).  Lewin also admits that he "probably" took these photographs with a Studio camera.  (*Id.* at 644).

It is clear that Lewin took these photographs at Avedon's instance and expense.  Avedon specifically asked Lewin to take these photographs, instructing him where to go and whom to photograph.  In this way, Avedon provided the impetus for these photographs, and directed, at least to some extent, how Lewin should capture them.  *See Marvel Characters*, 726 F.3d at 139 ("Actual creative contributions or direction strongly suggest that the work is made at the hiring party's instance.").  Because Lewin admits that he likely used a studio camera for the shoot, the photographs were also taken at Avedon's expense.  *Marvel Characters*, 726 F.3d at 139 ("The 'expense' component refers to the resources the hiring party invests in the creation of the work.").

Accordingly, I hold that Lewin does not own the copyright to the photographs in this category.

iii.   *Seattle Museum of Art Photographs*

The final category for which there is no genuine issue of material fact involves images Lewin photographed to document an Avedon exhibit at the Seattle Museum of Art.  *See*

(Foundation SUF ¶¶ 241, 243).  Lewin has apparently retained some of these photographs.  (*Id.* ¶ 244).  Lewin has disclaimed any copyright ownership over these photographs, because he admits that taking them was part of his job.  (*Id.* ¶¶ 247–48).  This claim is therefore moot.

### D. Categories of Photographs For Which Summary Judgment Is Not Appropriate

Summary judgment is not appropriate for the remainder of the categories at issue in this suit.  As I will discuss below, genuine issues of material fact remain for each.

#### i.  *Avedon Retrospective Exhibit at the Metropolitan Museum of Art (Lewin Category 1)*

In 1978, Avedon became the first living photographer ever to be given a single-artist show at the Metropolitan Museum of Art.  (Foundation SUF ¶ 13).  The photographs in this category, taken by Lewin, capture broad views of the exhibit.  The images contain both Avedon's photographs, as they were displayed on the walls of the Metropolitan Museum, as well as visitors observing the exhibit.  (Lewin SUF, Ex. 1, at 1–2).  Lewin claims that he took these photographs "on his time over several days, including a weekend."  (Lewin SUF ¶ 46).  This account is corroborated by an affidavit submitted by Adrian Panaro, who served as a studio assistant during some of Lewin's time at the Studio.  *See* (Panaro Aff. [ECF No. 108] at ¶ 26) ("As regards the Metropolitan show, the photographs taken by me, and those by Lewin . . . were all done at our discretion and were not directed or assigned.").

The Foundation correctly points out, however, that part of Lewin's duties did involve photographically documenting Avedon's museum exhibits.  (Lewin Dep. 677–678).  Lewin admits that he photographically documented this exhibit in particular, (Lewin Response to Statement of Undisputed Facts ("Lewin Response") [ECF No. 105] at ¶ 255), but contends that he turned over those negatives to Avedon, which are now with the Foundation, (Lewin Dep. 677).

The fact that Avedon at times required Lewin to take photographs of Avedon's exhibits does not negate the fact that Lewin could have taken additional, different photographs on his own time, for his own purposes.  Lewin contends that he was very proud of this exhibit, and that he wanted to document it as an important moment in his life, in addition to it being an important moment in Avedon's life.  *See* (*id.*) ("I was there because I printed the exhibition. I had emotional – invested emotionally in the exhibition. I cared about the exhibition and I like to see how people react to the photographs.").  Whether this claim is credible is an issue for the jury.  Therefore, I deny both party's summary judgment motions as they relate to the photographs in this category.

> ii.  *Portraits of Avedon Posing with His Father's Image (Lewin Category 2)*

Avedon exhibited photographs of his dying father in the Museum of Modern Art in 1974. (Lewin SUF ¶ 58).  While preparing for the exhibit, Lewin claims that he asked Avedon to sit for a portrait posing in front of the images of his father they planned on hanging in the exhibit.  (*Id.* ¶¶ 58–59).  According to Lewin, Avedon agreed, and Lewin photographed Avedon accordingly. (*Id.* ¶¶ 60–63).

The Foundation disputes Lewin's account, and contends that it was Avedon who asked Lewin to photograph him.  As evidence of its claim, the Foundation submits excerpts from the book Lewin was seeking to have published.  In one excerpt, Lewin stated as follows:  "Though [Avedon] normally disliked being photographed, *he asked me* to document him with the photographs in the show."  (Thompson Decl., Ex. 117 [ECF No. 91-43] at RAF1971) (emphasis added).  In another excerpt, from a different version of the book,[13] Lewin wrote:

> Dick himself did not like to be photographed, and therefore was not a willing sitter.
> *I had attempted* several times to do a portrait of him, but it was not an easy task.

---

[13] It is unclear from the record whether this is an earlier or later version of the book.

> He had a preconceived idea of what he wanted to look like, and therefore was in control, indirectly directing the sitting.
>
> Dick was in control before I was to take his portrait, arranging the prints around him.  He was a willing sitter this time, and we had more than one sitting.  He let me photograph him in front of his father's portraits . . . .

(Thompson Suppl. Decl., Ex. 221, at RAF346) (emphasis added).  The Foundation also claims, and Lewin does not contest, that Lewin used Studio cameras for the sitting.  (Foundation RSUF ¶ 321).

Lewin notes that one of the images in this category was published in a magazine called *Fotografia*, and was credited to Lewin.  (Lewin SUF ¶ 65); (Rule 56.1 Statement [ECF No. 106] at 497–98); (Lewin SUF, Ex. 5 [ECF No. 90-5] at 1245).  This does not prove, however, that Lewin is the copyright owner of the photograph; Lewin could be given credit as the photographer without necessarily owning the copyright to the photograph.  *Cf. Estate of Burne Hogarth*, 342 F.3d at 156 (explaining that the creator of a work is not deemed the copyright owner if the work was created as a work for hire).

Summary judgment is not warranted here because there remain genuine issues of material fact that a jury will need to assess.  Lewin claims that he asked Avedon to sit for the portrait, and the Foundation argues that it was Avedon who requested that Lewin take the photograph.  The credibility of this testimony will have to be judged by the jury.

The jury will need to make its assessment in light of the book excerpts noted above; those excerpts do not suffice to warrant summary judgment.  Although Lewin says in the first excerpt that Avedon asked Lewin to take his portrait, the second excerpt is more ambiguous as to whether Lewin took the photograph at Avedon's behest.  It notes that *Lewin* "had attempted several times to do a portrait" of Avedon, seemingly placing the origination of the idea with Lewin.  Lewin also states in that excerpt that although Avedon was in control, that control was

31

only "indirect[]."  Although the two excerpts, to some extent, contradict one another, it appears that Lewin wrote both of them before this copyright dispute began, and therefore Lewin had no more motivation to prevaricate in one than the other.

Accordingly, I deny both parties' summary judgment motions for the photographs in this category.

### iii.   Marlborough Gallery Exhibit (Lewin Category 3)

In 1975, Avedon exhibited some of his photographs at the Marlborough Gallery. (Foundation SUF ¶ 228).  Lewin printed the photographs, and helped Avedon plan and set up the exhibit.  (*Id.* ¶ 230); (Lewin SUF ¶¶ 78–82).  Lewin claims that while he was working with Avedon on constructing the exhibit, he asked Avedon to pose inside a miniature model of the exhibit Avedon's team had constructed as a part of their planning process.  (*Id.* ¶ 83).  According to Lewin, Avedon agreed, and Lewin took several pictures of him posing inside the model.  (*Id.* ¶¶ 84–85).  In addition, Lewin claims that, on weekends, he took pictures of people visiting the Marlborough show.  (*Id.* ¶ 86).

The Foundation again points out that one of Lewin's responsibilities was documenting Avedon's exhibits, and argues that Lewin's pictures of the exhibition itself are therefore works for hire.  (Foundation SUF ¶¶ 231–32).  In Lewin's deposition, he specifically admitted that Avedon instructed him to photographically document the Marlborough exhibit.  (Lewin Dep. 91–92).  However, Lewin asserts that he gave those photographs and their negatives to Avedon, and that they have remained with the Studio since that time.  (*Id.* at 92).  Lewin claims he kept only the photographs that Avedon did not instruct him to take, photographs he took on his own time. (*Id.*)

The Foundation also argues that Avedon instructed Lewin to take the photographs showing Avedon posed inside the miniature model.  (Foundation SUF ¶¶ 234, 343).  As proof of this claim, it notes that a photographer for the New York Times took an almost identical photograph of Avedon posing inside the miniature model sometime after Lewin's photograph. (*Id.* ¶ 347).

Finally, Lewin claims that one of his photographs in this category was published by "a New York publication" with a credit to him.  (Lewin Aff. ¶ 49).  Lewin provides no proof of this, however, and as already discussed above, a photographer credit (as opposed to a copyright credit) is not clear evidence Lewin owns the copyright to that photograph.

None of the evidence put forward by either party is sufficient to warrant summary judgment here.  Lewin and the Foundation offer conflicting characterizations of the photographs in this category, and the circumstances of their creation.  These characterizations and circumstances will have to be assessed by the jury.  Accordingly, I deny both party's summary judgment motions for the photographs in this category.[14]

### iv.   *Avedon Portrait with Mask (Lewin Category 4)*

At a reception for one of Avedon's exhibits, Lewin created a mask made from Avedon's passport photograph, and orchestrated a surprise for Avedon, whereby each attendee wore the mask when Avedon arrived.  (Lewin SUF ¶¶ 97–98).  Lewin claims that years later, he asked Avedon to pose for a photograph with the mask, and Avedon agreed.  (*Id.* ¶ 99).  In 1994, one of these photographs was auctioned at Sotheby's on Lewin's behalf.  (*Id.* ¶ 109); (Lewin SUF, Ex. 5, at 1246–47).  Lewin alleges that after the auction, Avedon sent Lewin a note, congratulating

---

[14] In addition to this category, as Lewin describes it in his complaint, the Foundation also requests summary judgment as to photographs Lewin took of the Marlborough Gallery itself.  For all the reasons set forth with respect to the Metropolitan Museum category, above, summary judgment is not warranted as to these photographs.

him on the auction of the photograph.  (Lewin SUF ¶ 110).  As evidence, Lewin submits a note from Avedon which states: "Dear Gideon, I'll make a bet that your old picture of me ends up on the cover of a national magazine.  It gets better as I get older.  A million thanks."  (Lewin SUF, Ex. 6 [ECF No. 90-6] at 1975).

The Foundation alleges that Avedon instructed Lewin to take these portraits, and notes that Avedon's note lacks context, and does not explicitly refer to the photograph auctioned at Sotheby's.  *See* (Foundation Response ¶¶ 100, 102, 109–10).

Summary judgment is not warranted here.  Although the fact that Lewin auctioned one of these photographs at Sotheby's lends credence to his copyright claim, a reasonable juror could find that Lewin did so without owning copyright to the photograph.  Additionally, Avedon's note is not sufficiently specific to demonstrate that the photographs in this category belong to Lewin.  The jury must assess the ownership claims relating to the photographs in this category by weighing the credibility of the parties' testimony and the other evidence discussed above.  Accordingly, I deny both parties' summary judgment motions for the photographs in this category.

### v.  Casual Portraits of Avedon (Lewin Category 5)

Lewin claims that Avedon let Lewin photograph him for several casual portraits between 1975 and 1976.  (Lewin SUF ¶¶ 112–13).  The Foundation possesses a nearly identical version of one of these photographs.  (Foundation SUF ¶ 308).  A stamp on the back of that photograph states "[t]his photograph may not be reproduced without written permission of Richard Avedon."  (*Id.* ¶ 308); (Thompson Decl., Ex. 120 [ECF No. 91-43] at RAF4967).  Lewin claims that this stamp was placed on the photograph after he ceased working for Avedon, and that he did not give anyone permission to do so.  (Lewin Response ¶ 308).

The dispute over the photographs in this category will need to be decided by a jury. The jury will have to assess Lewin's claims about these photographs, in light of the stamp found on the back of the photograph noted by the Foundation, and ascertain whether Lewin's story is credible. The stamp, although providing evidence in favor of the Foundation's claims, is not so significant as to warrant judgment as a matter of law. Accordingly, I deny both parties' summary judgment motions for the photographs in this category.

> vi.   *Master Class Photographs (Lewin Category 9)*

In 1967, Avedon and Marvin Israel, another photographer, conducted a "master class" for up-and-coming photographers. (Foundation SUF ¶ 391). The class took place once a week for ten weeks. (*Id.* ¶ 392). Lewin attended three of these classes, but did not pay the tuition or interview to be admitted into the class. (*Id.* ¶¶ 393–95). Lewin claims that the assignment Avedon gave him as one of the students in the class was to "photograph the class from [Lewin's] point of view." (Lewin SUF ¶ 163). Lewin set up cameras on the ceiling of the Studio, where the class took place, and took photographs of the class by remote. (Lewin Dep. 126). In an audio recording of one of the classes, Avedon answers a question from another participant by stating: "As [Lewin's] assignment, I wanted him to photograph the class. Now, what he's doing, and how he's doing it, I don't know." (Foundation RSUF ¶ 398); (Thompson Suppl. Decl., Ex. 225 at 1:08:04–1:08:27).

Lewin claims that he sent a print of one of these images to Avedon for his 70th birthday. (Lewin Aff. ¶ 77). Lewin also submits as evidence a note from Avedon to Lewin, where Avedon thanks Lewin for a photograph Lewin sent him. (*Id.*); (Lewin SUF, Ex. 6, at 1254) (thanking Lewin for the "gift" and noting that "[i]t's just wonderful to see all of us in a completely forgotten evening, absolutely alive. . . . Really, Gideon, thank you for the years we worked

together and for this treasured time capsule.").  Lewin contends that this note was in response to

the photograph Lewin alleges he sent Avedon.  (Lewin Aff. ¶ 77).  Additionally, Lewin licensed

some of these photographs on several occasions: to a publishing company producing a book on

Diane Arbus, to the Moderna Museet in Stockholm, and to a filmmaker producing a

documentary about Marvin Israel.  (Lewin SUF ¶¶ 169–72).  Lewin was credited as the

photographer in the Arbus book, (Lewin SUF, Ex. 4 [ECF No. 90-4] at 523); it is unclear

whether or how he was credited in the other instances.

Lewin argues that because these photographs were part of his assignment for the class,

they were not photographed within the scope of his employment by the Studio, and that therefore

he owns the photographs.  (Lewin Mem. in Supp. 21–22).  The Foundation claims that Lewin

attended the class only to assist Avedon, and that the images Lewin photographed were at

Avedon's behest.  (Foundations SUF ¶¶ 396, 398).

This, too, is a matter that must be decided by the jury.  Avedon's recorded statement

could be interpreted as acknowledging that Lewin took these photographs for Avedon, or as

noting that Lewin had a class assignment.  Avedon's note to Lewin suggests that Avedon did not

claim ownership over at least one of these photographs, but the note does not specify the

photograph to which Avedon is referring.  The jury will have to weigh this evidence and decide

whose characterization of these photographs is more credible.  Accordingly, I deny both parties'

summary judgment motions for the photographs in this category.

### vii.   *Montana Photographs (Lewin Category 12)*

Lewin claims that in 1979, Avedon decided to entertain some of his Japanese clients at a

ranch he co-owned in Montana.  (Lewin SUF ¶ 214).  Avedon allegedly invited several guests to

accompany him, including Lewin.  (*Id.* ¶ 215).  According to Lewin, one of Avedon's goals for

the trip was to begin research on a new photography project Avedon planned on pursuing in Montana.  (*Id.* ¶¶ 216–17).  Lewin states that one of the reasons he went to Montana was to advise Avedon on the sorts of equipment Avedon would need to bring to Montana for the new project.  (*Id.* ¶ 218).  Lewin claims that all the photographs he took during this trip were "personal snapshots," unrelated to his role advising Avedon on equipment.  (*Id.* ¶ 219).  Lewin also notes that years later, he gave Avedon a copy of some of these photographs, one of which Avedon acknowledged with a note.  (*Id.* ¶¶ 222–23); (Thompson Decl., Ex. 222 [ECF No. 112-14] at RAF564) (stating "Dear Gideon, You're hilarious!  I have no idea where or when this great picture was taken.  All my true character seems to have come out in that western moment.  Thank you for thinking of me on this unthinkable day.").

The Foundation argues that Lewin went to Montana to assist Avedon in scouting locations, and that the photographs in this category are those scouting photographs.  (Foundation Mem. in Supp. 33).  It notes that at least five of Lewin's photographs feature two people who would later become subjects in Avedon's Montana project.  (Foundation SUF ¶ 386).  In addition, the Foundation points out that two contact sheets, identical to the ones in Lewin's possession relevant to this category, were found in the Foundation's archive, in an envelope labeled "negatives missing."  (*Id.* ¶ 388).  Lewin contends that he gave Avedon these two contact sheets, and that there is no evidence when "negatives missing" was written on the envelope.  (Lewin Response ¶ 388).

All of this presents conflicting evidence that supports both Lewin's version of events (Lewin's testimony; Avedon's note to Lewin) and the Foundation's version of events (the envelope labeled "negatives missing"; the similarity between individuals photographed by Lewin and those ultimately photographed by Avedon).  These are factual disputes the jury will need to

weigh and decide.  Therefore, I deny both parties' summary judgment motions for the photographs in this category.

### viii.    *Ireland Photographs, 1979 (Lewin Category 17)*

Avedon went to Ireland in 1969 to photograph Angelica Huston for a *Vogue* photoshoot, and brought Lewin and others along with him.  (Lewin SUF ¶¶ 277–78).  Lewin claims that during their time in Ireland he took "personal photographs," some of which featured Avedon. (*Id.* ¶¶ 279–80).

The Foundation contends that Lewin took all of the photographs in this category within the scope of his employment by the Studio, and that the Foundation therefore owns the copyright in these photographs.  (Foundation Mem. in Supp. 30–32).  It claims that at least some of the other photo assistants who accompanied Avedon to Ireland also took behind-the-scenes photographs, but filed them with the Studio.  (Foundation Mem. in Supp. 31).  Additionally, the Foundation possesses several negatives that exactly match some of the photographs in this category—photographs Lewin claims to have taken and to own.  (Foundation SUF ¶ 471).

Summary judgment is not warranted here.  The fact that other photo assistants turned in their behind-the-scenes photographs to the Studio, if true,[15] certainly lends credence to the Foundation's claim that assistants were sometimes required to take behind-the-scenes photographs for the Studio.  However, Lewin contests the Foundation's account of these behind-the-scenes photographs.  *See* (Lewin Response ¶¶ 471–72, 475).  Even if the Foundation's claim is true, it is not enough by itself to warrant summary judgment.  Avedon may have had a

---

[15] The Foundation submits as evidence various photographs possessed by the Foundation related to Avedon's Ireland photoshoot, but the record is unclear as to who took these photographs.  *See* (Thompson Decl., Ex. 139 [ECF No. 91-43]).  The Foundation alleges that Harvey Mattison, apparently one of the Studio's photo assistants, photographed most of these images, *see* (Foundation SUF ¶¶ 472–73), but offers no evidence of this fact beyond Lewin's testimony that Mattison photographed some of the images related to this category that Lewin has in his possession, *see* (*Id.* ¶ 473).

different relationship with Lewin than he did with these assistants.  After all, Lewin states on numerous occasions that he had a "special relationship" with Avedon, s*ee, e.g.*, (Lewin SUF ¶ 37), and other Studio employees have attested similarly, *see* (Valeska Aff. ¶¶ 7–8) (stating that "Gideon had a very special relationship with [Avedon]," and noting that "he was the only one allowed to use [Avedon's] studio for his personal work and his assignments"); (Panaro Aff. ¶ 13) (noting that Lewin had an arrangement with Avedon whereby "Lewin gave sixty percent (60%) of the money he made back to Mr. Avedon, as compensation for the use of the studio and assistants").  Additionally, Valeska states that assistants "were allowed to take home prints of [their] documentary photographs so long as the studio had the same prints on file."  (Valeska Aff. ¶ 5).  Thus, it is possible that the assistants took their behind-the-scenes photographs of their own volition, and simply provided Avedon with copies of them.

These are all contested facts that the jury will have to consider and weigh based on its view of the relevant evidence and the credibility of the witnesses discussed above.  Accordingly, I deny the parties' summary judgment motions for the photographs in this category.

### ix.   *Categories Involving Separate Lewin Jobs*

Several of the categories noted in Lewin's complaint consist of photographs Lewin took in connection with Avedon photoshoots.  In each, Lewin claims he was hired for a separate job and paid separately from Avedon to capture behind-the-scenes photographs of Avedon's photoshoots.  *See, e.g.*, (Lewin Aff. ¶¶ 82–84) (discussing how *Vogue* magazine needed behind-the-scenes photographs for a promotional documentary the magazine intended to share with advertisers, and stating that *Vogue* accordingly paid Lewin $500 to photograph behind-the-scenes images during an Avedon photoshoot of Rene Russo and Lauren Hutton).  For some of these alleged assignments, Lewin points to entries in the Studio work diary, where jobs were

recorded, asserting that separate entries and job numbers, exclusive to Lewin, exist for these jobs.  *See, e.g.*, (Lewin SUF ¶ 184) (asserting that a job number made for Lewin, GL74074, was entered into the Studio work diary); (*id.* ¶ 200).

The Foundation claims that all of these photographs were taken at Avedon's request and that they therefore belong to the Foundation.  (Foundation Mem. in Supp. 30–32).  It argues that the notations in the Studio's diary highlighted by Lewin are inconclusive, and cannot support the contention that the images in these categories were photographed by Lewin independent of Avedon.  (Foundation RSUF ¶ 429).

For each of these categories, the jury will need to weight the testimony and evidence submitted by both parties, and determine which story it finds more credible.  Neither party has presented sufficient evidence to resolve all genuine issues of material fact.  Accordingly, I deny both parties' summary judgment motions for the following categories:

- Japan Behind-the-Scenes Photographs (Lewin Category 8).  *See* (Lewin SUF ¶¶ 145–51); (Foundation SUF ¶¶ 488–91).

- *Vogue* Studio Shoot of Rene Russo and Lauren Hutton (Lewin Category 10).  *See* (Lewin SUF ¶¶ 178–83); (Foundation SUF ¶¶ 427–37).

- Lauren Hutton Shoot for *Newsweek* (Lewin Category 11).  *See* (Lewin SUF ¶¶ 199–203, 208); (Foundation SUF ¶¶ 437–41).

### x.   The Remaining Categories

For the remainder of these categories, the analysis is the same.  Lewin claims that he took the photographs in the particular category on his own time, unrelated to his employment by the Studio, and without being asked to do so by Avedon.  *See, e.g.*, (Lewin SUF ¶ 126) (stating that Lewin would "snap a picture" when he would bring Avedon a cake for his birthday); (*id.* ¶ 234) (asserting all images Lewin photographed during a barbeque event he attended in Dallas with Avedon were "personal snapshots.").  The Foundation counters that Lewin was required to take

the photographs in question as one of his duties as an Avedon employee. *See, e.g.*, (Foundation Response ¶¶ 126, 234). For these categories, neither party provides any additional evidence to support their claims beyond their conflicting testimony. Therefore, for each of these categories, the jury must assess the credibility of the testimony at issue, and summary judgment is unwarranted.

These categories are as follows:

- Birthday Portraits (Lewin Category 6). *See* (Lewin SUF ¶¶ 125–130); (Foundation SUF ¶¶ 365–72).

- Photographs of Jorge Luis Borges (Lewin Category 7). *See* (Lewin SUF ¶¶ 135–37); (Foundation SUF ¶¶ 442–46).

- Barbeque Photographs in Dallas, 1979 (Lewin Category 13). *See* (Lewin SUF ¶¶ 228–34); (Foundation SUF ¶¶ 283–95).

- Photographs on the Concord/Janice Dickinson Paris Photoshoot (Lewin Category 14). *See* (Lewin SUF ¶¶ 241–45); (Foundation SUF ¶¶ 538–49).

- Rene Russo Baja, California Photoshoot (Lewin Category 16). *See* (Lewin SUF ¶¶ 266–70); (Foundation SUF ¶¶ 530–37).

- McCann Erickson Exhibition (Lewin Category 18). *See* (Lewin SUF ¶¶ 287–90); (Foundation SUF ¶¶ 210–27).

- *Harper's Bazaar* Photoshoot in Paris, 1965 (Additional Foundation Category). *See* (Lewin Response ¶¶ 448–64); (Foundation SUF ¶¶ 448–64).

- Photoshoot for Les Ballets Trockadero de Monte Carlo (Additional Foundation Category). *See* (Lewin Response ¶¶ 418–26); (Foundation SUF ¶¶ 418–26).

- Clairol Photoshoot of Dorothy Hamill (Additional Foundation Category). *See* (Lewin Response ¶¶ 550–57); (Foundation SUF ¶¶ 550–57).

## VI. THE FOUNDATION'S CONVERSION, REPLEVIN, AND UNJUST ENRICHMENT CLAIMS

The Foundation alleges that Lewin stole certain Avedon-created materials from the Studio during the time he worked there, namely "21 prints of photographs by Mr. Avedon, three contact sheets with enlarged images of Mr. Avedon's photos . . . , two exhibition notebooks, one

Printer's notebook, and one transparency of an Avedon photo." (Foundation SUF ¶ 558). Lewin contends that Avedon gifted the prints, contact sheets, and transparency to him, and that the printer's notebook contains his own work.

## A. Legal Standard

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Zaretsky v. Gemological Inst. of Am., Inc.*, No. 14-CV-1113, 2014 WL 1678990, at *3 (S.D.N.Y. Apr. 28, 2014) (Scheindlin, J.) (internal quotation marks omitted). A party alleging conversion must prove: "(1) the plaintiff has an immediate right to possession of the property converted; (2) the defendant's possession of the property was unauthorized; (3) the defendant acted to exclude the rights of the lawful owner of the property; (4) the property is specifically identifiable; and (5) the defendant is obligated to return the property." *In re Cross Media Mktg. Corp.*, No. 06-CV-4228, 2006 WL 2337177, at *6 (S.D.N.Y. Aug. 11, 2006) (Mukasey, J.). Similarly, replevin to recover property is appropriate when a party "establish[es] a superior possessory right in the chattel," and shows it is "entitled to immediate possession of that property." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 455–56 (S.D.N.Y. 2014) (Dolinger, Mag. J.).

"Under New York state law, the basic elements of an unjust enrichment claim are: 1) defendant was enriched; 2) such enrichment was at the expense of the plaintiff; and 3) the circumstances were such that in equity and good conscience the defendant should make restitution." *Malmsteen*, 477 F. Supp. 2d at 667 (internal quotation marks omitted).

## B. Analysis

The Foundation claims that Lewin stole these materials from the Studio based on (1) the fact that the materials are not listed as having been gifted to Lewin in the Studio's print registry,

*see* (Foundation Mem. in Supp. 37–38), (2) the existence of irregularities in the prints Lewin possesses, *see* (*id.*), and (3) the Foundation's claim that Studio policy dictated that all printer's notebooks be destroyed once they were no longer useful, *see* (*id.* at 38–39).

### i.   The Print Registry

Although its date of origin is disputed, both parties agree that the Studio used a registry to keep track of the prints Avedon sold or gifted to individuals over the course of his career.  *See* (Foundation SUF ¶¶ 51–52).  The Foundation has submitted copies of the registry as evidence, and notes that Lewin is not listed as an owner of any of the Avedon prints the Foundation claims Lewin stole.  (*Id.* ¶ 561); (Martin Decl., Exs. 8–20).

Lewin asserts that Avedon did not set up his print registry until 1975, and for that reason, the gifts Lewin alleges Avedon made to him would not have been listed in the registry.  *See* (Lewin Mem. in Opp'n 21–22).  In support of his claim, Lewin provides the affidavit of Alicia Longwell,[16] a former employee of Avedon, hired in November 1975 to, *inter alia*, "inventory and record existing photographic prints made by Avedon."  (Longwell Decl. [ECF No. 140] at ¶ 3).  Longwell states that "[she] did not go back and reconstruct the history of previous donations, gifts, etc. because records were not available any [sic] period prior to November 1975.  Therefore only recent gifts given to Mr. Lewin and others were recorded at that time."  (*Id.* ¶ 6).

The Foundation disputes Longwell's testimony, and claims that "Avedon had his Studio staff keep meticulous records tracking the disposition of prints he made, including those gifted to

---

[16] The Foundation argues that I should strike Longwell's affidavit as untimely because Lewin submitted it approximately one month after the deadline for such submissions.  *See* (Foundation Mot. to Strike [ECF No. 155] at 5–7).  I do not find the Foundation's arguments persuasive.  Lewin included Longwell in his list of witnesses, *see* (Lewin Mot. to Strike [ECF No. 156] at 1), and the Foundation spoke with Longwell during the discovery period, *see* (Foundation Mot. to Strike 6 & n.1).  Additionally, I have considered the reply declaration of James Martin, *see generally* (Martin Reply Decl. [ECF No. 150-1]), which responds to Longwell's affidavit.  Because I find that the Foundation has not suffered any significant prejudice by Lewin's late submission, I will consider Longwell's affidavit alongside Martin's reply affidavit.

Studio employees," and notes that "the earliest such record of a gift to a Studio employee dates from 1958." (Foundation RSUF ¶ 51). The declarations of James Martin, the Foundation's current executive director, and Paul Roth, a former Foundation executive director, both agree that Avedon kept "meticulous" records about his prints. *See* (Martin Decl. [ECF No. 93] at ¶ 56); (Roth Suppl. Decl. [ECF No. 124] at ¶ 5). Martin's reply affidavit also explains, in great detail, the workings of Avedon's registry, and notes that it currently contains 329 entries representing times in which Avedon gifted a print prior to 1976,[17] and 7 entries where Avedon sold a print during the same time period. *See* (Martin Reply Decl. ¶ 11).

It is unclear whether the Foundation has submitted any documentary evidence to prove that registry entries date back as far as 1958. The Foundation's records concerning the gifts Avedon made to his employees[18] include information establishing the date those prints were printed. Those print dates, if accurate, date back as far as 1958. *See, e.g.*, (Martin Decl., Ex. 8 at RAF3926). However, the fact that a photograph was printed in a given year does not establish that the photograph was sold or gifted in that same year. Thus, these records do not prove that Avedon's print registry recorded gifts given prior to 1975. Assuming the registry is accurate,[19] it does demonstrate that some information about Avedon's prints was either maintained prior to 1975, or was reconstructed to account for dates prior to 1975, because at least the date of printing is included in the registry.

---

[17] Martin's reply declaration states that he searched for entries between 1946 and 1975. (Martin Reply Decl. ¶ 11). I assume this means that entries made in 1975 were included in Martin's search. I would think a search of the years between 1946 and 1974 would have been a more effective demonstration of Martin's point, because Longwell began work in 1975, and therefore, Longwell could have entered some of the records reflected in Martin's declaration at the time of the gift or sale, rather than by reconstructing the history of previous gifts or sales. However, I assume that most of the entries noted in Martin's declaration concern gifts or sales prior to 1975, because Martin's testimony on this issue would be highly misleading otherwise.

[18] The record is unclear as to whether these records are part of Avedon's print registry, or separate. *See* (Martin Decl., Ex. 8).

[19] Lewin contends that the registry information provided by the Foundation is "incomplete and therefore, not reliable." (Lewin Response ¶ 216).

Nonetheless, even if the Foundation is correct that certain registry entries date back as far as 1958, it does not mean that the Foundation's registry includes *every* pre-1975 instance where Avedon gave a gift.  This may be particularly the case for a gift from Avedon to Lewin, given that Lewin was a long-time, and at least according to Lewin, "special," employee, and perhaps, friend.  *See* (Lewin SUF, Ex. G [ECF No. 105-1] at 1266) (displaying an inscription from Avedon to Lewin stating, "For Gideon, dear friend across the years, Dick Avedon").  Some gifts given to long-time employees like Lewin might have been made in a far more casual manner.[20] It is the jury who will have to decide whose description of the registry is correct—Lewin's characterization of the registry as incomplete, or the Foundation's description of it as "meticulous," as well as whether Lewin's relationship with Avedon might have led Avedon to gift prints to Lewin in a more casual, or less ordinary, manner.

### ii.   Print Irregularities

The Foundation contends that irregularities in the disputed prints possessed by Lewin demonstrates that Lewin stole these prints.

### *The Graduate* and *The Legend of Lylah Clare* Print and Transparency

The first irregularities involve images Avedon photographed to promote two Hollywood films, *The Graduate* and *The Legend of Lylah Clare*.  Lewin possesses a print from *The Graduate* photoshoot, and a transparency from the *The Legend of Lylah Clare* photoshoot. (Foundation SUF ¶¶ 570, 574).  The Foundation claims that once all final materials were shipped to the client—in this case the film studio—it was the Studio's practice to destroy all

---

[20] Lewin alludes to as much during his deposition, claiming that Avedon gifted a particular contact sheet to Lewin during the time when Avedon "was editing, throwing out prints, certain prints, and he said this is for you, because I [i.e. Lewin] showed interest in it."  (Lewin Dep. 459).

photographic material related to photoshoots such as these, including the materials that Lewin now possesses.  (Foundation SUF ¶¶ 42, 44, 577);

Lewin contends that Avedon had no such policy in place, (Lewin SUF ¶ 309); (Steinbicker Aff. ¶ 9), and asserts that the Foundation has offered no documentary evidence proving the existence of such a policy.  (Lewin SUF ¶ 325).  The Foundation instead relies on the declaration of James Varriale, who testifies that "[a]ny print of an image other than the print Mr. Avedon chose to use as the final print for the client would be shredded or filed."  (Varriale Decl. at ¶ 10).

The jury will need to determine what Avedon's policies were with respect to the materials at issue here, if any, and decide whether Lewin rightfully possesses this print and transparency accordingly.  For that reason, I deny both parties' summary judgment motions for this print and transparency.

### Portfolio Prints

The Foundation also contests Lewin's possession of prints from two different photograph portfolios Avedon sold as limited edition sets.  The first portfolio, described by the Foundation as the "Minneapolis Portfolio," included photographs Avedon exhibited at the Minneapolis Institute of Fine Art in 1970.  (Foundation SUF ¶¶ 579–80).  Avedon issued thirty-five sets of the Minneapolis Portfolio. (*Id.* ¶ 580).  Both parties agree that the official prints in the Minneapolis Portfolio were each signed on the front by Avedon, and each bore an edition reference, such as "3/35" (i.e. the third edition of the thirty-five sets created) or "17/35" (i.e. the seventeenth edition of the thirty-five sets created).  (*Id.* ¶ 581).

Avedon originally considered including fifteen photographs in this portfolio, but ultimately decided to include only eleven.  (*Id.* ¶ 583).  In a letter the Foundation submits as

evidence, Avedon wrote that he decided to remove the four photographs from the portfolio "because they are either not up to the standards of the others as photographs or really bad prints, and [Avedon] would not want them in anybody's collection."[21]  (Foundation Apr. 10, 2015 Ltr., Ex. A [ECF No. 159-1]).  Lewin currently possesses prints of these four photographs. (Foundation SUF ¶ 588).

Lewin also possesses some of the prints that were included in the Minneapolis Portfolio. (*Id.*)  The Foundation claims that these prints exhibit other irregularities, including that they (1) are marked with incorrect, or inapplicable edition references (e.g., 5/35, when Avedon never printed 35 editions of that particular print), *see* (*id.* ¶¶ 593–95), (2) are signed in the wrong place, or not signed at all, *see* (*id.* ¶¶ 599–602), or (3) are marked with an edition reference that the Foundation claims is owned by someone other than Lewin, *see* (*id.* ¶¶ 592, 598) (describing prints in Lewin's possession as bearing a proper edition number, but claiming that "Lewin is not reflected as the owner" of that edition of the print in the Foundation's database).

The Foundation also argues that Lewin improperly retained prints from Avedon's "Hollywood Prints" portfolio.  *See* (*id.* ¶ 604).  These prints were issued in editions of fifty, yet the prints in Lewin's possession do not bear edition numbers, or Avedon's signature.  *See* (*id.* ¶¶ 604–06).

Although the irregularities highlighted by the Foundation lend force to the Foundation's claims, the established facts here are insufficient to find, as a matter of law, that Lewin stole

---

[21] Lewin contends that this letter should not qualify as admissible evidence at summary judgment, arguing that the letter is unsigned, and thus does not indicate who the author is.  (Lewin Apr. 14, 2015 Ltr. [ECF No. 160]).  He also asserts that it is unclear whether the letter was actually sent, as opposed to being merely a draft.  (*Id.*)  I do not find his arguments persuasive.

The letter clearly reads as though it was written by Avedon, and it is written on Avedon letterhead.  This seems sufficient to assume Avedon is the author, barring any evidence to the contrary.  Although it is true that there is no proof that Avedon sent the letter, whether it was sent is irrelevant to its evidentiary value.  The letter suggests that Avedon was unhappy with the quality of the four photographs he removed from the Minneapolis Portfolio. Whether he ultimately sent this letter or not, the sentiment recorded in the letter remains unchanged.

these prints from Avedon.  The jury will need to ascertain the ownership of these prints.  Lewin asserts that Avedon gifted these prints to him, and the Foundation has offered little evidence to prove Avedon would not have given Lewin "reject" prints from time to time.[22]  The fact that Avedon's letter states that he would not want the four rejected prints in anyone's collection lends some credence to the Foundation's conversion claim, but it is not enough, by itself, or in combination with the other testimony and evidence described above, to find, as a matter of law, that Lewin stole these prints.

Accordingly, I deny both parties' summary judgment motions for the prints related to the portfolios discussed above.

### iii.   The Printer's Notebook

The Foundation claims that printer's notebooks were used by the Studio staff to make notes concerning how to manually develop Avedon prints.  (Foundation SUF ¶¶ 39–40).  It asserts that Studio policy dictated that all such notebooks be destroyed when they were no longer useful.  *See* (Martin Decl. ¶ 62).  Lewin contends that such a policy never existed.  *See* (Lewin SUF ¶¶ 307, 309).  Lewin also claims that the notebook in his possession was made by him and contains his own notes, including notes concerning his personal clients.  *See* (Lewin Response ¶ 564).  The Foundation counters that Lewin's document production list refers to the notebook as the "Met Show Notebook," (Thompson Reply Decl., Ex. 234 [ECF No. 123-1]), which it contends shows that the notebook was used for the purpose of work (involving the Met show), rather than for Lewin's personal purposes.

---

[22] Again, Lewin's deposition suggests that Avedon might have done just that on certain occasions.  *See* (Lewin Dep. 459) (stating that as Avedon "was editing, throwing out prints, certain prints, and he said this is for you, because I [i.e. Lewin] showed interest in it.").

This, too, is a factual dispute the jury will need to decide.  The jury must evaluate the notebook and its contents, and assess whether it contains material personal to Lewin.  Members of the jury will also need to determine whether they find credible the Foundation's claims that all printer's notebooks were to be destroyed after use.  For this reason, I deny both parties' summary judgment motions concerning this notebook.[23]

## VII.    TORTIOUS INTERFERENCE WITH LEWIN'S PUBLISHING CONTRACT

Lewin moves for summary judgment on his claim of tortious interference.  He claims that the Foundation tortiously interfered with his publishing contract with Assouline Publishing.  Lewin's claim must be dismissed, because it is barred by the *Noerr-Pennington* doctrine.

### A.  Legal Standard

To prove a claim of tortious interference under New York law, a plaintiff must demonstrate "'[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom.'"  *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 104 (2d Cir. 2012) (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424 (1996)).

Courts routinely apply the *Noerr-Pennington* doctrine when assessing tortious interference claims.  *Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen*, 313 F. Supp. 2d 339, 343 (S.D.N.Y. 2004) (Conner, J.).  Although the doctrine originated to provide

---

[23] The Foundation also claims that Lewin possesses "two other notebooks that have notes reflecting Mr. Avedon's exhibition installation," (Foundation RSUF ¶ 564), but makes no specific argument as to why Lewin should not be deemed the owner of these notebooks.  Just as with the printer's notebook discussed above, these notebooks will also need to be assessed by the jury.  For this reason, I deny both parties' summary judgment motions concerning these notebooks.

that "[t]hose who petition the government for redress are generally immune from antitrust liability," *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993), it has been extended to "conduct or communication which is incident to or attendant upon effective litigation," *PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*, 21 F. Supp. 2d 350, 356 (S.D.N.Y. 1998) (McKenna, J.), *rev'd on other grounds*, 219 F.3d 92 (2d Cir. 2000).  The doctrine extends not only to good-faith litigation to enforce a copyright, but also to pre-litigation "threat letters."  *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 100 (2d Cir. 2000).

 "An exception to the *Noerr–Pennington* doctrine exists where the governmental petitioning is a mere sham covering up attempts to interfere directly with the business relationships of competitors."  *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 33 F. Supp. 2d 122, 125 (D. Conn. 1998) (citing *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).  To determine whether the litigation is a "sham" courts assess whether the litigation is "(1) 'objectively baseless' and (2) intended to cause harm to the defendant 'through the use [of] governmental *process*—as opposed to the *outcome* of that process . . . .'"  *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002) (emphasis in original) (quoting *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993)).

## B.  Analysis

 Lewin argues that the Foundation tortiously interfered with his publishing contract with Assouline by asserting that the Foundation owned the copyright to the Lewin-created images Lewin intended on including in his book.  *See* (Compl. ¶¶ 43–48).  He contends that if the Court, or a jury, determines that Lewin owns the copyright to the photographs at issue in this suit, then

the Foundation must be deemed to have had no justification for making such an assertion, and in

that event, Lewin's claim for tortious inteference should be granted.  (Lewin Mem. in Opp'n 24).

That is incorrect.  Even if a jury ultimately determines that Lewin does own the copyright

to these photographs, that is not enough, by itself, to find that the Foundation tortiously

interfered with Lewin's contract.  Lewin would need to demonstrate that the "threat letter" the

Foundation sent to Assouline threatened "sham litigation."  Yet Lewin has made no attempt to do

so—nor could he.  As is evident from my refusal to grant summary judgment as to the ownership

claims for most of the disputed photographs, the questions concerning who owns the copyright to

these photographs depend on the resolution of genuine disputes as to material facts.  Even if the

Foundation is ultimately unsuccessful in this case, it was not objectively baseless for it to claim

copyright ownership over these photographs.  Nor has Lewin submitted any evidence that would

suggest that the Foundation intended to harm him through the use of this litigation, as opposed to

through the outcome of this litigation.

Accordingly, I deny Lewin's motion for summary judgment on his tortious interference

claim, and grant the Foundation's motion seeking to dismiss the claim.[24]

## VIII.   THE FOUNDATION'S FRAUD CLAIM

Lewin moves to dismiss the Foundation's fraud claim.  I grant the motion.

---

[24] Lewin makes two claims in his complaint, one for "tortious interference with ongoing contractual relationships," and the other for "tortious interference with prospective business advantage."  *See* (Compl. ¶¶ 37–52).  Both are barred by the *Noerr-Pennington* doctrine, *see Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*, 679 F. Supp. 2d 413, 431 (S.D.N.Y. 2009) (Buchwald, J.), *aff'd in part, vacated in part on other grounds*, 414 F. App'x 334 (2d Cir. 2011) (applying the *Noerr-Pennington* doctrine to a claim of tortious interference with a contract); *Friends of Rockland Shelter Animals, Inc.*, 313 F. Supp. 2d at 343 ("When a plaintiff claims the defendant tortiously interfered with a prospective business advantage by lobbying a governmental entity, courts applying New York law analyze the First Amendment issue under the *Noerr–Pennington* doctrine."), and thus both are dismissed.

### A.  Legal Standard

"To recover damages for fraud under New York law, a plaintiff must prove: '(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury.'" *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 447 (S.D.N.Y. 2013) (Scheindlin, J.) (quoting *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009)).  A plaintiff must establish each element of its fraud claim by "clear and convincing evidence." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 181 (2d Cir. 2007).  "Thus, the appropriate summary judgment question is whether the evidence on the record could support a reasonable jury finding that the plaintiff has shown each element of . . . a fraud . . . by clear and convincing evidence." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 444 (S.D.N.Y. 2012) (Scheindlin, J.).

Plaintiffs do not need to establish a defendant's intent to defraud; rather "[p]laintiffs may satisfy the scienter requirement by producing evidence of conscious misbehavior or recklessness." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (internal quotation marks omitted).  Such recklessness involves "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996).

### B.  Analysis

The Foundation claims that Lewin intentionally deceived the Foundation into working with him on his book project by making "a number of representations" about the project that the Foundation alleges Lewin knew to be false.  (Am. Countercl. ¶¶ 122–24).  The Foundation,

however, provides no evidence demonstrating "conscious misbehavior or recklessness" on Lewin's part.  It alleges only that Lewin intentionally provided the Foundation with a mock-up of his book that contained far few images than the number he intended to include.  *See* (Foundation Mem. in Opp'n 24–25).  However, it provides no evidence that Lewin intended to deceive the Foundation, nor that Lewin's actions constituted "conscious misbehavior or recklessness."  Additionally, the Foundation does not explain why or how Lewin's mocked-up book induced the Foundation to agree to work with Lewin in a way it would not have had Lewin included more photos in the mock-up.

I grant Lewin's motion to dismiss the Foundation's fraud claim.

## IX.     THE FOUNDATION'S MISAPPROPRIATION OF TRADE SECRETS CLAIM

Lewin moves to dismiss the Foundation's misappropriation of trade secrets claim.  I grant the motion.

### A.  Legal Standard

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999).

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (internal quotation marks omitted).  New York courts have looked to the following factors in considering whether information constitutes a trade secret:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Mgmt., Inc. v. Janien,* 82 N.Y.2d 395, 407 (1993).

## B.  Analysis

The Foundation alleges that Lewin misappropriated a Foundation trade secret by stealing one of Avedon's printer's notebooks.  *See* (Am. Countercl. ¶¶ 114–18).  It contends that the notebook contains notes detailing how to create certain Avedon prints.  *See* (Foundation SUF ¶ 567).  The Foundation's implication seems to be that access to the information contained in the notebook could provide Lewin with the ability to reproduce impermissibly Avedon's photography.

The Foundation's claim must be dismissed because the Foundation has failed to demonstrate the second prong of the misappropriation of trade secrets test.  Even assuming that the printer's notebook contains information that constitutes a trade secret, the Foundation has offered no evidence that Lewin *used* the trade secret in any way.[25]  Even if the notebook did provide Lewin with the recipe necessary to reproduce Avedon's photography, the Foundation has not alleged that Lewin did, in fact, reproduce any Avedon print.

Accordingly, I grant Lewin's motion to dismiss the Foundation's misappropriation of trade secrets claim.

---

[25] The Foundation's counterclaim alleges that "Lewin took photographs of trade secrets contained in the Notebook," and "shared those photographs with Assouline."  (Am. Countercl. ¶ 119).  It also claims that Lewin showed those photographs to people other than Assouline.  (*Id.*)  However, the Foundation has submitted no evidence of these assertions, and makes no mention of them in its Statement of Undisputed Facts.

**X.      CONCLUSION**

For the reasons set forth above, I DISMISS Lewin's copyright ownership claims relating to the Rachel Welch Baja, California photoshoot (Lewin Category 15), the photographs concerning the *Alice in Wonderland* theatrical performance, and the Seattle Museum exhibit photographs.  I DISMISS Lewin's tortious interference claim.  I DISMISS the Foundation's counterclaims of copyright ownership, fraud, and misappropriation of trade secrets.  I DISMISS the Foundation's counterclaim for conversion and replevin relating to the approximately 4,200 photographs Lewin took during his time working for Avedon.

A pretrial conference in this action shall be held on July 2, 2015, at 11:00 a.m.  If either party is unavailable at that time, the parties shall submit to me a joint letter suggesting other available dates by June 29, 2015.

The Clerk of Court is directed to close ECF Nos. 131, 135, 137, and 154.


SO ORDERED.

Dated: New York, New York
       June 26, 2015

                                 _____
                                           /s/
                                   KIMBA M. WOOD
                                United States District Judge